JUDGE HELLERSTEIN

# 12 CIV 9419

FILE UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
ROHM AND HAAS COMPANY,                :   Civil Action No. _____
                                      :
                         Petitioner,  :
                                      :
v.                                    :   PETITION TO VACATE
                                      :   ARBITRATION AWARD
ARKEMA FRANCE,                        :
                                      :
                         Respondent.  :
------------------------------------------------------------- x

RECEIVED DEC 27 2012 U.S.D.C. S.D.N.Y. CASHIERS

  Petitioner Rohm and Haas Company ("ROH") petitions this Court to vacate the Final Award on the Merits (the "Final Award") issued on October 9, 2012 in *Rohm and Haas Co. v. Arkema France*, No. 50 154 T 00532 10 (Am. Arb. Ass'n). ROH lost the underlying arbitration under circumstances it believes warrant closer scrutiny by this Court. The Tribunal's Final Award in favor of respondent Arkema France ("Arkema") was diametrically opposed to the Tribunal's earlier decision rejecting Arkema's Application for Summary Disposition on the same issues, and seemingly could only have been the product of a manifest disregard for the law clearly recognized by the Tribunal in support of the earlier decision. Moreover, after receiving the Final Award, ROH learned of significant connections between the neutral member of the Tribunal and Arkema and its counsel, strongly suggesting bias, which he did not disclose at any point in the proceedings. These circumstances fatally tainted the Final Award, unfairly prejudiced ROH and, accordingly, compel vacatur of that award.

  In support of this petition, ROH relies upon, and incorporates herein by reference, the Declaration of Nathan P. Eimer (including the exhibits attached thereto) and ROH's

Memorandum of Law in Support of its Petition to Vacate Arbitration Award, both of which are filed concurrently with this petition. In further support of this petition, ROH states as follows:

## PARTIES

1. Petitioner ROH is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business at 100 South Independence Mall West, Philadelphia, Pennsylvania.

2. Respondent Arkema France ("Arkema") is a societe anonyme organized and existing under the laws of France, with a principal place of business at 420 rue d'Estienne d'Orves, Colombes, France.

## JURISDICTION AND VENUE

3. This dispute falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, as implemented by 9 U.S.C. §§ 201-208. This Court has subject matter jurisdiction pursuant to 9 U.S.C. § 203 and 28 U.S.C. § 1332(a)(2), as there exists complete diversity of citizenship between the parties and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

## FACTS

**A. Background**

5. ROH and Arkema (f/k/a Elf Atochem S.A. and ATOFINA) were parties to an April 3, 1998 Swap Agreement (the "1998 Swap Agreement") pursuant to which ROH supplied methyl methacrylate ("MMA") to Arkema in the United States and Arkema supplied MMA to ROH in Europe. *See* April 3, 1998 Swap Agreement, Ex. A to Decl. of Nathan P. Eimer dated December 21, 2012 ("Eimer Decl."). The 1998 Swap Agreement had an initial term of ten years

and automatically renewed for one-year periods cancellable only upon four years' written notice. *See id.* at 1; 1998 MMA Supply Contract, Ex. B to Eimer Decl. at 2.

6. In 2000, the parties signed an amendment to the 1998 Swap Agreement (the "2000 Swap Amendment"), agreeing to execute and deliver a five-year replacement swap agreement to commence on January 1, 2008 and to initiate and pursue discussions about the possible conversion of the format of their swap. 2000 Swap Amendment, Ex. C to Eimer Decl. at 1. There is no dispute that both parties subsequently fulfilled their obligations to discuss a swap conversion. Although no "replacement swap agreement" was in fact signed, the 2000 Swap Amendment was sufficient under the New York statute of frauds and constituted a valid agreement to extend the swap through 2012.[1]

7. In January 2008, the parties signed a Swap Agreement Extension (the "2008 Swap Extension"), which varied the volumes, pricing, and specifications for swapping product during 2008. 2008 Swap Extension, Ex. D to Eimer Decl. The "Initiation and Duration" section of the 2008 Swap Extension contained the following:

> This is an extension of an ongoing swap (agreement dated April 3, 1998). New price terms are effective 1/1/08, and new quantity terms reflective of 2008 full year. This agreement will automatically renew from year to year unless cancelled by either party, in writing, by October 1 of the preceding year.

*Id.* In addition, the "Other" section of the 2008 Swap Extension stated:

> The April 3, 1998 MMA Swap Agreement will remain in force from year to year as stated above except as to such alternative specifications and except as otherwise amended herein.

*Id.*

---

[1] At the arbitration, ROH submitted documentary and testimonial evidence that the parties' intent in signing the 2000 Swap Amendment was to extend their swap relationship to 2012 and believed that the "replacement swap agreement" language would give effect to that intent. Arkema argued that the 2000 Swap Amendment was only an agreement to agree. The Tribunal made no ruling on the issue.

8. ROH maintained that the 2008 Swap Extension simply amended the price, volume, and specification terms for swapping MMA on a temporary basis, but did nothing to relieve either party of the obligation to swap through the end of 2012. Arkema contended that the cancellation provision in the 2008 Swap Extension applied to the 1998 Swap Agreement, as amended, and not simply to the agreed-upon terms contained in the 2008 Swap Extension. Arkema also argued that because the 2008 Swap Extension covered the same subject matter as the 2000 Swap Amendment, it superseded the 2000 Swap Amendment as a matter of law.

9. After Arkema refused to continue swapping MMA, ROH filed a Notice of Arbitration and Statement of Claim with the American Arbitration Association ("AAA") on August 13, 2010, asserting that Arkema breached the parties' agreement by refusing to swap MMA through 2012 according to the terms of the replacement swap agreement and sought damages of approximately $26 million. *See* Notice of Arbitration and Statement of Claim, Ex. E to Eimer Decl.

**B.   Arbitration Proceedings and Arbitrator Disclosures**

10. The 1998 Swap Agreement was governed by New York law and contained a dispute resolution provision providing for arbitration in the City of New York under the International Rules of Arbitration of the AAA (the "AAA Rules"). *See* MMA Supply Contract, Ex. B to Eimer Decl.

11. Pursuant to the arbitration provision, ROH appointed Alan Z. Golden of Davies Ward Phillips & Vineberg LLP as an arbitrator; Arkema appointed John M. Townsend of Hughes Hubbard & Reed LLP ("Hughes Hubbard"); and Messrs. Golden and Townsend jointly selected John A.M. Judge of Stikeman Elliott LLP ("Stikeman Elliott") as the "neutral" and chair of the Tribunal.

4

12.     In connection with their appointment to the Tribunal, the arbitrators provided disclosure statements regarding their connections to the parties and their counsel.

13.     Mr. Judge disclosed only the following:

- Stikeman Elliott represented a German corporation in its purchase of a salt business from ROH and The Dow Chemical Company.

- Stikeman Elliott represented Morgan Stanley in relation to financing for an acquisition of a business from Dow Chemical Canada Inc.

- Stikeman Elliott provided Canadian legal advice to Arkema's counsel, Buchanan Ingersoll & Rooney PC ("Buchanan Ingersoll"), for matters relating to clients of the latter firm.

- Partners of Stikeman Elliott may have had relationships with attorneys at Eimer Stahl LLP – ROH's counsel – and Buchanan Ingersoll.

- Mr. Judge had a professional relationship with Mr. Townsend in that they were both members of the London Court of International Arbitration and both served on the North American Users Council of that organization.

Based on Mr. Judge's disclosures and affirmations, ROH did not challenge his independence or impartiality.

14.     In connection with their disclosures, the arbitrators provided answers to a number of questions on a Notice of Appointment form. Mr. Judge answered "No" to the following question: "Do you or your law firm presently represent any person in a proceeding involving any party to the arbitration?" He also answered "No" to the following catch-all question: "Are there any connections, direct or indirect, with any of the case participants that have not been covered by the above questions?"

15.     The Notice of Appointment form emphasized the importance of complete disclosure of even potential sources of impartiality, stating:

> It is most important that the parties have complete confidence in the arbitrator's impartiality. Therefore, please disclose any past or present relationship with the parties, their counsel, or potential witnesses, direct or indirect, whether financial, professional, social or of any other kind. *This is a continuing obligation*

> *throughout your service on the case and should any additional direct or indirect contact arise during the course of the arbitration . . . it must be disclosed.* Any doubts should be resolved in favor of disclosure.

(Emphasis supplied.)

16. With the Notice of Appointment, each arbitrator signed and had notarized a copy of The Arbitrator's Oath:

> I attest that I have diligently conducted a conflicts check, including a thorough review of the information provided to me about this case to date . . . . I understand that *my obligation to check for conflicts and make disclosures is ongoing for the length of my service as an arbitrator in this matter*, and that failing to make appropriate and timely disclosures may result in my removal as arbitrator from the case and/or my removal from the AAA's Roster of Neutrals.

(Emphasis supplied.)

17. In addition, each arbitrator executed a Notice of Compensation Arrangements that stated:

> As an arbitrator in this matter, you have an ongoing obligation to disclose any direct or indirect relationship with the case participants. Your failure to make disclosures in a timely manner would be a serious transgression and may be grounds for your removal as arbitrator from this case and/or from the AAA's Roster of Neutrals.

18. Under Article 8(1) of the AAA Rules, the parties had the right to challenge the appointed arbitrators based on their disclosures.[2] Based on the disclosure statements, oaths, and affirmations of Mr. Judge, ROH did not challenge his appointment to the Tribunal.

## C. The Tribunal's Ruling on Arkema's Application for Summary Disposition

19. Shortly after the composition of the Tribunal was finalized, Arkema filed an Application for Summary Disposition ("Application") arguing that the 2008 Swap Extension, on its face, superseded the 1998 Swap Agreement, as amended, as a matter of law because the

---

[2] Article 8(1) of the AAA Rules states: "A party may challenge any arbitrator whenever circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence. A party wishing to challenge an arbitrator shall send notice of the challenge to the administrator within 15 days after being notified of the appointment of the arbitrator or within 15 days after the circumstances giving rise to the challenge become known to that party." *See* AAA Rules, Ex. F to Eimer Decl.

agreements concerned the same subject matter. Application for Summary Disposition, Ex. M to Eimer Decl. Arkema also argued that the 2008 Swap Extension gave the parties the right to cancel their entire swap arrangement upon three months' notice. Specifically, Arkema argued that the phrase "as stated above" in the "Other" section of the 2008 Swap Extension made it clear that "This agreement" in the cancellation provision in the "Initiation and Duration" section meant the 1998 Swap Agreement, as amended:

> In its opening paragraph, the 2008 Agreement states that "[t]his agreement will automatically renew from year to year unless cancelled by either party, in writing, by October 1 of the preceding year." In its closing paragraph, the document states that the "[1998 Agreement] will remain in force *from year to year as stated above* ... and except as otherwise amended herein." The "as stated above" language can only be referring to the opening paragraph, providing that the agreement would automatically renew from year to year unless cancelled by either party....' There is no other reasonable interpretation of that sentence.

*Id.* at 15 (emphasis in original) (citations omitted).

20.   In response, ROH asserted that the 2008 Swap Extension expressly reaffirmed the 1998 Swap Agreement, and, pursuant to the "same subject matter" cases cited by Arkema, the unamended portions of the 1998 Swap Agreement remained valid and enforceable. ROH's Response in Opposition, Ex. N to Eimer Decl. at 6. ROH also argued that the termination provision in the Initiation and Duration section of the 2008 Swap Extension did not give the parties a right to cancel the entire swap arrangement. *Id.* at 8-9.

21.   On June 10, 2011, the Tribunal held a day-long hearing on Arkema's Application. On July 12, 2011, the Tribunal issued Procedural Order No. 3, a 16-page opinion in which the Tribunal unanimously denied Arkema's Application, determining, as a matter of law, that the cancellation provision in the 2008 Swap Extension was *ambiguous*. *See* Procedural Order No. 3, Ex. Q to Eimer Decl. In addition, the Tribunal stated that it could not conclude, as a matter of law, that the 2008 Swap Extension fully displaced the 2000 Swap Amendment.

7

22.     In support of its well-reasoned ruling, the Tribunal relied upon the language of the 2008 Swap Extension, as well as the "context" of the cancellation clause in relation to other terms of the 1998 Swap Agreement. *Id.* at 13-15, ¶ 32. Specifically, the Tribunal held that the words "This agreement" "could reasonably reference the specific agreement in the proceeding sentence, which is limited to new terms on price and quantity, rather than the 1998 Swap Agreement as amended." *Id.* at 13, ¶ 32(a). "The clause itself contains no language which would direct a *reasonably intelligent person* to one agreement rather than the other." *Id.* (emphasis supplied). In addition to the language of the cancellation provision itself, the Tribunal cited the 2008 Swap Extension's inconsistent references to the 1998 Swap Agreement, and concluded that "[g]iven the different nomenclature for the 1998 Swap Agreement, it is unclear which agreement is intended by the word 'agreement' in the sentence creating the cancellation or termination right." *Id.* at 13, ¶ 32(b). With respect to Arkema's supersession argument, the Tribunal noted that "the Tribunal is not persuaded that Arkema has clearly established at this stage of the proceedings that the 2008 Swap Agreement Extension fully displaces the 2000 Second Amendment as a matter of law." *Id.* at 15, ¶ 32.

23.     Given the Tribunal's extensive written analysis of the legal issue presented and the unanimous legal conclusion that the 2008 Swap Extension was ambiguous, it invited the parties to submit extrinsic evidence at the hearing related to the parties' intent in entering into the 2008 Swap Extension. *Id.* at 15, ¶ 34. This decision could not have been taken lightly, as the Tribunal was at that time well-aware that proceeding past summary disposition would require substantial pre and post-hearing briefing, voluminous evidentiary submissions and a week-long hearing in which multiple witnesses would testify.

**D.    The Final Award**

24. Following the Tribunal's invitation to submit extrinsic evidence, ROH submitted its evidence in the form of a 53-page Memorial with 74 exhibits and three witness statements, which explained how Arkema breached a mutual obligation to swap through 2012. In response, Arkema submitted a 79-page Counter-Memorial with 127 exhibits, two witness statements, and a 90-page expert report that had 184 exhibits. Each party then submitted another brief with supplemental exhibits and witness statements.

25. In April 2012, the Tribunal conducted a week-long hearing where the parties cross-examined four fact witnesses and two experts and made their factual and legal arguments. Following the hearing, each party submitted two additional briefs. In total, the Tribunal received hundreds, if not thousands, of pages of briefing and exhibits, in addition to the live testimony that was provided at the hearing.

26. Despite the volume of extrinsic evidence provided to the Tribunal in order to interpret the provision it already ruled was ambiguous, the Tribunal reversed its ruling at summary disposition and concluded in the Final Award that "[t]he primary source for ascertaining the intention of the parties is the actual contractual language used by the parties." Final Award, Ex. Z to Eimer Decl. at 45, ¶ 108. Thus, more than a year after the summary disposition ruling, the Tribunal "approached afresh" the language of the cancellation provision. *Id.* at 27, ¶ 64. Though a "reasonably intelligent person" could not determine the meaning of "This agreement" in the Tribunal's July 2011 summary disposition order, in the Final Award, the Tribunal, without reference to any extrinsic evidence, concluded just the opposite and found that, "[o]n a plain and ordinary reading of the language," "This agreement" referred to the 1998 Swap Agreement.

> Had the parties intended that only the "terms" as to price and quantity referenced in the second sentence would be subject to the automatic renewal, then one would

9

>have expected them to use the same word "terms" in the third sentence for purposes of narrowly defining the subject matter of the critical cancellation right. However, they did not. They used the word "agreement". On a plain and ordinary reading of the language, first proposed by ROH during negotiations and accepted by Arkema, the word "agreement" as used in the third sentence is referable back to the same word "agreement" in the first sentence.

*Id.* at 46, ¶ 111.

27. Although the Tribunal's new interpretation purportedly was based on the plain and ordinary meaning of the words, this analysis was wholly contrary to the summary disposition ruling and employed reasoning that *neither ROH nor Arkema ever proffered at any point in the proceedings*. Indeed, starting with its Application and continuing through the post-hearing briefs, Arkema always relied upon the phrase "as stated above" in the "Other" section of the 2008 Swap Extension in order to explain why it believed that "agreement" meant the 1998 Swap Agreement. ROH maintained that "This agreement" merely referenced the agreed-upon business terms reflected in the 2008 Swap Extension. The Tribunal itself invented the explanation used in the Final Award to interpret what it had previously characterized as ambiguous cancellation language from which the parties' intent could not be determined. In doing so, it effectively created an entirely new cancellation provision that neither party had contemplated or intended.

28. In the Final Award, the Tribunal also reversed itself with respect to Arkema's supersession argument. In its summary disposition ruling, the Tribunal summarily dismissed Arkema's contention that the 2008 Swap Extension, on its face, concerned the same subject matter, and thus superseded, any prior agreement to swap through 2012. Procedural Order No. 3, Ex. Q to Eimer Decl. at 13-15 ¶ 32. But in the Final Award, the Tribunal reasoned that, "*[b]ased on a plain reading of the 2008 Swap Agreement,*" the subject matter essentially is the same as the prior agreement. Final Award, Ex. Z to Eimer Decl. at 51, ¶ 127 (emphasis supplied). The Tribunal did not cite any new evidence or law in support of its contradictory conclusion; rather,

it was based upon the same arguments, case law, and evidence that were before the Tribunal during summary disposition.

29. In its summary disposition ruling, moreover, the Tribunal stated that "a reasonable person" would expect clear language in a formal amendment if the parties intended to reduce a cancellation notice provision from four years to three months. Procedural Order No. 3, Ex. Q to Eimer Decl. at 14, ¶ 32(c). But in the Final Award, the Tribunal stated: "Instead of the four year notice requirement found in the 1998 Supply Agreement, the parties agreed in the 2008 Swap Agreement Extension to a new right to cancel upon written notice given on or before October 1 prior to the automatic annual renewal of the agreement on January 1, 2009, or any subsequent year." Final Award, Ex. Z to Eimer Decl. at 56, ¶ 140. The Tribunal cited nothing new in support of this additional reversal.

30. The Tribunal clearly recognized that it was contradicting its own earlier legal analysis and rulings. Following the recitation of the facts and law, the Tribunal began its substantive analysis in the Final Award with a section called "Impact of Procedural Order No. 3 and the Reasons for Dismissal of Summary Disposition Application." Despite the significance of its prior order and because the Final Award could not coexist with it, the Tribunal simply dismissed its first ruling as preliminary. The Tribunal gave the prior ruling no weight at all, concluding that "Procedural Order No. 3 had no preclusive effect on this issue" and "[t]he Tribunal therefore approached afresh the issue of the proper interpretation of the cancellation right in issue." *Id.* at 27, ¶ 64.

31. As more fully set forth in ROH's Memorandum of Law in Support of its Petition to Vacate Arbitration Award, the Final Award should be vacated because the Tribunal manifestly

11

disregarded the applicable and governing law by deliberately ignoring established legal principles and completely disregarding its prior legal rulings.

E.  **Undisclosed Connections between the Arbitrators and Arkema**

33. Following the inexplicable disregard of earlier legal rulings reflected in the Final Award, and baffled by what could have prompted such an irrational result, ROH, through the Internet, discovered a number of connections between the neutral arbitrator and Arkema and its counsel that the arbitrator failed to disclose. Indeed, Mr. Judge had connections to Arkema and its counsel throughout the time period relevant to the parties' dispute, and they continued up to, and during, the arbitration.

33. Mr. Judge, the Tribunal Chairman, "neutral" arbitrator, and drafter of the Final Award,[3] failed to disclose the following:

- Mr. Judge's law firm, Stikeman Elliott, represents Canada Fluorspar Inc. ("CFI"), a company that is 20% owned by Arkema. On June 15, 2011 – just six months after Mr. Judge provided his disclosures, and during the pendency of the arbitration – it was announced that Stikeman Elliott represented CFI in a substantial joint venture with Arkema. Arkema's investment in the project totaled $83.5 million. The joint venture agreement also allowed Arkema to become a significant owner of Stikeman Elliott's client, acquiring approximately 20% of CFI's outstanding shares. The joint venture would be controlled by both Stikeman's client and Arkema, and the two companies would share profits from the joint venture.

    In addition, the CEO of CFI became the CEO of the new joint venture with Arkema. The joint venture was of great value to Stikeman Elliott's client. In announcing the deal, CFI's CEO stated that "[t]he transaction with Arkema culminates an extensive search for a partner in the St. Lawrence project that has been underway for the past three years. It provides our shareholders with recognition of value and sources the immediate cash needed to promptly commence development of the operations at St. Lawrence . . . ."

    Further, on November 15, 2011, it was announced that Bernard Roche, the Chief Executive Officer of Arkema, Inc.— Arkema's U.S.-based affiliate—and Patricia

---

[3] Correspondence from Mr. Judge confirmed that he authored the Award. *See* Sept. 12, 2012 Email from J. Judge, Ex. GG to Eimer Decl. ("Further to your email, the award is not yet completed and the delay rests with me. Without going into detail, a large portion is completed but I am still working on the award. I will be circulating a draft to my co-arbitrators by the end of this week for their review.").

McCarthy, the Chief Financial Officer and Senior Vice President of Arkema, Inc., had been appointed to CFI's Board of Directors.

- Stikeman Elliott represented co-defendants of Arkema in at least two cases in the Ontario Superior Court of Justice. In *Irving Paper Ltd. v. Atofina Chemicals Inc.*, which concerned alleged antitrust activity in the hydrogen peroxide industry, Stikeman Elliott represented defendants Solvay Chemicals Inc. and Solvay S.A. Arkema, as well as several Arkema affiliates, were also defendants in that litigation. Indeed, Arkema's counsel here, Steve Bizar of Buchanan Ingersoll, represented Arkema in the U.S. case concerning the same alleged conduct in the hydrogen peroxide industry. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2009).

  Similarly, in *A&M Sod Supply Ltd. v. Akzo Nobel Chemicals B.V.*, which concerned alleged antitrust activity in the monochloroacetic acid industry, Stikeman Elliott represented defendants Aventis S.A., Hoechst AG, Hoechst Celanese Corp., and CNA Holdings, Inc. Arkema and its affiliates were also defendants in that litigation and, again, Buchanan Ingersoll represented Arkema in the U.S. version of this litigation. *See Diamond Chemical Co. v. Akzo Nobel Chemicals B.V.*, 517 F. Supp. 2d 212 (D.D.C. 2007).

34.     Mr. Judge's failure to disclose these connections is particularly troubling, given that he is the arbitrator that the parties intended to be completely neutral. The parties' agreement allowed for each side to appoint one arbitrator and that the third arbitrator would be selected by the other two arbitrators, so that at least one member of the Tribunal had no prior contact with either party and would presumably be completely neutral. ROH trusted and expected that the neutral member of the Tribunal, and author of the Final Award that ultimately denied ROH's claim, was truly neutral and that neither he nor his firm had any connection with Arkema or its counsel.

35.     Due to Mr. Judge's incomplete disclosure, ROH was unaware of any of the foregoing connections during the appointment process and for the duration of the arbitration. ROH only recently discovered Mr. Judge's undisclosed connections after receiving the Final Award, which was authored by Mr. Judge. ROH relied upon the completeness and accuracy of Mr. Judge's disclosures and had no reason to believe it needed to independently investigate potential conflicts, particularly in light of the affirmations contained on their disclosure forms.

Had ROH known about these connections, it would have challenged Mr. Judge's impartiality and independence.

36.  ROH has no way of knowing whether the connections highlighted in this petition reflect the entirety of the undisclosed conflicts as ROH's research was necessarily limited to only publicly available information. Nor does ROH know what Arkema knew and when it knew it. Nonetheless, the contacts that ROH has discovered are more than sufficient for this Court to conclude that Mr. Judge violated his duty to disclose material conflicts of interest.

37.  As more fully set forth in ROH's Memorandum of Law in Support of its Petition to Vacate Arbitration Award, these undisclosed material conflicts require vacatur of the Final Award.

## DEMAND FOR RELIEF

Wherefore, Petitioner Rohm and Haas Company requests that the Court enter a judgment vacating the Final Award pursuant to 9 U.S.C. § 10, remanding the matter to the American Arbitration Association for new proceedings before a new Tribunal, and granting Petitioner Rohm and Haas Company such other and further relief as the Court deems just and proper.

Dated: December 26, 2012

Respectfully submitted,

_____
EIMER STAHL LLP
Nathan P. Eimer (#NE2996)
Vanessa G. Jacobsen
Arin C. Aragona
Sarah E. Malkerson
224 S. Michigan Ave., Suite 1100
Chicago, Illinois 60604
(312) 660-7600

CLEARY GOTTLIEB STEEN
& HAMILTON LLP
Thomas J. Moloney

Ari MacKinnon
One Liberty Plaza
New York, NY 10006
(212) 225-2000

*Counsel for Petitioner Rohm and Haas Company*